JANVIER, Judge.
The question in this forma pauperis compensation case is whether the physical condition from which plaintiff now suffers results from a degenerative bone or joint condition of gradual development, becoming more and more painful from day to day, or can be said to have resulted from a series of occupational occurrences each causing pain but each of such slight traumatic significance that no one of them, without considerable exaggeration, can be designated as an accident.
There is no dispute over the rate of pay of plaintiff on which compensation payments, if due, should be based, but both plaintiff and defendant, the compensation insurer of the employer, have appealed from the judgment which awarded the plaintiff compensation for total disability for a period of 29 weeks and partial disability of 30% for the remaining portion of a period of 400 weeks.
The plaintiff was employed as a sales person by Entringer Bakeries, Inc., known locally as McKenzie’s. Her duties were principally attending to the wants of customers, doing certain minor janitorial work, and the removal and replacement of trays containing cakes, donuts and other comestibles to or from the several glass cabinets which served also as counters.
On June 11, 1961, while plaintiff was attempting to remove one of the trays from a cabinet, she says that it stuck in its position and that, in straining to remove it, she felt sudden pain in her back. She said: “As I was pulling out this pan of donuts I was in a half stooping position, and I had difficulty in getting the pan out and it was loaded with donuts, and I experienced a sharp, burning pain in my back and was unable to straighten up, * * She reported the matter and, feeling unable to work, was taken to her home by her husband, who was summoned. She did not consult a physician and returned to work after a few days. She continued to work though, she says, in pain, and four months later, on October 26, 1961, while cleaning one of the glass counter containers, she says that she again felt great pain in her back. She does not mention any unusual occurrence, but merely says that she was cleaning the cabinet. She said: “In cleaning this case I knelt down and tried to do it as carefully as I could, to try and not put a strain on me, and I had to reach inside the case to clean it. * * * I experienced a great deal of pain in the process of doing it.” She reported this incident to the employer and was told to employ a physician of her own selection at the expense of the insurer or the employer. She consulted Dr. Fortunato Padua and remained under his treatment until November 17, though on November 14 Dr. Padua referred her to Dr. Russell C. Grunsten, an orthopedic specialist. It may be important to *371 state here that Dr. Grunsten stated that plaintiff did not report to him the second of the two occurrences, that involving the cleaning of the cabinet, hut merely told him of the earlier occurrence. And Dr. Grun-sten also said that she told him that she had sustained pain while working in her garden. She denies that she told him anything about an occurrence in the garden. He says that she told him about no unusual occurrence, but that she had experienced “an accentuation of pain in the mid-back area without any further injury or any further strenusuous activity except for the fact that she did increase her working capacity to the point that she was working four (4) days a week instead of as usual, two (2) days a week.” After this second occurrence, she returned to work and continued until January 25, 1962, when she says that again while cleaning one of the cabinets, she suffered pain in her back. She says that in cleaning the cabinet she had to remove a tray shelf, “which is very heavy to handle to get it out, I kind of lost my balance — I was in a sort of stooping-squatting position, and I fell against the back cabinet * *
Plaintiff was examined by Dr. Mannie D. Paine, a physician employed by the employer or its insurer, and Dr. Paine had her sent to the Southern Baptist Hospital the next day where she remained until February 1, 1962. She was under treatment of Dr. Paine and his associate, Dr. Baker, until she returned to work early in March, 1962, and she remained at work until July, 1962, at which time, because of extreme pain apparently without any special occurrence, she stopped working and says she has not been able to do any work since.
Plaintiff was referred to orthopedist specialist, Dr. G. Gernon Brown and Dr. Carl P. Cullucchia, and on May 27, 1963, she was examined by Dr. Byron M. Unkauf, also an orthopedist specialist, and she remained under his care.
During the periods between the occurrences Mrs. Crimen was able to do her work but with the assistance of other employees and sometimes of her husband. The trays which she handled were 24 inches wide and 36 inches long and weighed not more than 12 pounds.
It thus becomes necessary for us to determine whether her present disability, either total or partial, was caused, accentuated or aggravated by any one or more of the trivial occurrences, or is the result of the gradual degenerative development of a bone or joint condition which, according to all of the doctors, develops in most human beings as age advances, in some more rapidly than in others. Mrs. Crimen was 53 years of age and there is evidence which indicates that her degenerative condition had advanced more than would have been normal in a woman of her age. It is interesting to note that in Fulco v. Lumbermen’s Mutual Casualty Company, La.App., 110 So.2d 871, the specialist found that “the osteoporosis and the hyperthrophic arthritis conditions * * * were due to congenital or developmental causes.” They also found that “osteoporosis tends to make the patient more susceptible to bony injuries because of the softened condition of the vertebra.” This would seem to corroborate the medical opinions in the record before us.
The expert testimony is voluminous and an attempt on our part to discuss it at length would serve no useful purpose.
It is, of course, true that where an employee enters service with a physical condition below normal and an accident occurs which might not have caused disability in a normal person but causes disability in the case of a particular employee, the employer takes the employee as he finds him and cannot be heard to attempt to escape liability on the ground that the employee was already suffering from the condition which the accident merely aggravated.'
On the other hand, where a person is already in a condition which will be aggravated or accelerated by mere day to day living, doing the simple things which *372 anyone does at home, as well as at work and, while at work, suffers pain, not because of trauma but solely because the condition is such that any movement of the body may cause pain, it cannot be said that there has been a traumatic injury and that the diability results from it.
Only one expert was of the opinion the condition resulted from a spinal defect caused by trauma. He felt that one or possibly two of the spinal discs may have been traumatically injured. He did not find that a disc had been ruptured but thought, rather hesitantly, that from one of the discs “there was a slight protrousion.”
No one of the several other experts testifying for plaintiff or for defendant pointed to disc trouble as the cause of disability. Their views were slightly divergent on the question of whether plaintiff was suffering from osteoporosis or osteoarthritis. We have been able to detect only a slight difference between these two conditions. Both terms find their derivation in the Latin word meaning bone — osteoporosis meaning degeneration in the bone evidenced by a reduction in the density of the matter composing it, whereas osteoarthritis is caused by the formation of excessive calcium in the joint rather than in the bone itself.
All doctors agreed that either of these conditions is of gradual development and that, as age advances, either of these conditions becomes more obvious, more disabling, and more painful. While the experts, whether for the plaintiff or the defendant, were not in complete agreement, we gather from all of the testimony that normal day to day living, without trauma, sometimes develops into a disabling condition.
One of the experts gave evidence which we think expresses the predominant view of all. Referring to plaintiff he said that “certainly no evidence of residual disability can be identified which would be ascribed to a single specific injury.” His attention was directed to the fact that plaintiff claims to have had three occurrences, and he explained what he meant then by saying that he did not mean three specific traumatic injuries, but he was referring to the conditions resulting from “day to day living,” in other words, he referred to the osteoarthritis as being the result of “wear and tear.”
We are convinced that plaintiff’s condition is not the result of any traumatic injury, nor of the series of occurrences which she relates, and we are convinced that the occurrences did nothing to accentuate or accelerate the already developing condition from which plaintiff suffered, and that certain movements of her body, such as reaching into the cabinet, sweeping the floors, or doing any such things resulted in a sudden spasm of pain which was temporarily disabling.
It must be conceded, of course, that however slight the occurrence may be, if it is something which might not normally occur and which causes injury, there is liability in compensation, but where there is nothing in the slightest degree traumatically unusual, there can be no recovery merely because of pain suffered in doing the ordinary things one must do in daily living and in normal work.
Plaintiff was compensated for each period during which she could not work and she is entitled to nothing more.
When we come to consider the question of costs, we find that C.C.P. article 5188 provides that:
“Except as otherwise provided by Articles 1920 and 2164, if judgment is rendered against a party who has been permitted to litigate without the payment of costs, he shall be condemned to pay the costs incurred by him, and those recoverable by the adverse party.”
However, we note also that in the exception provided by Article 2164 and referred to in Article 5188, an appellate court “may tax * * * costs * * * against any party *373 to the suit, as in its judgment may be considered equitable.” Under the circumstances of this case, we feel it equitable to require all costs to be paid by defendant.
Accordingly, the judgment appealed from is annulled, avoided and reversed and plaintiff’s suit is dismissed, defendant to pay all costs.
Reversed.